**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RANTNETWORK, INC.** | : | **CIVIL ACTION NO. 4:11-CV-1283** |
| **Plaintiff** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **TROY R. UNDERWOOD** and | : | |
| **CHRISTINA A. UNDERWOOD,** | : | |
| **Defendants** | : | |

## MEMORANDUM

This civil action is about an email. According to the complaint (Doc. 1-4),

plaintiff Rantnetwork, Inc., suffered over $5 million in damages as the result of an

email that defendants Troy R. and Christina A. Underwood ("Mr. Underwood" and

"Mrs. Underwood," respectively) sent near the end of 2009 to Rantnetwork's CEO

and several of the company's investors. (Id. ¶¶ 18, 24.) This email allegedly caused

one of the company's investors, Dr. Angelo Mancuso, to withhold further

investment in the company, despite his previously expressed willingness to invest

up to $500,000. (Id. ¶¶ 22, 17.) The complaint describes an avalanche of negative

consequences that flowed from Dr. Mancuso's cessation of further investment,

ultimately causing Rantnetwork losses that it values at $5,478,166.00. (Id. ¶ 24.)

Rantnetwork's complaint contains two counts against Mr. and Mrs.

Underwood: Count I alleges that the Underwoods' sending of that fateful email

constituted intentional interference with prospective contractual relations between

Rantnetwork and Dr. Mancuso, for which they seek a judgment in their favor in the

above-mentioned sum; Count II seeks an injunction against the Underwoods to prohibit them from meddling with Rantnetwork's future business affairs.

Presently before the court is the Underwoods' motion (Doc. 3) to dismiss the complaint (either for this court's lack of personal jurisdiction over them or for Rantnetwork's failure to state a claim) or alternatively to stay this action pending the outcome of an action previously filed in California state court. For the reasons that follow, the court will grant the motion.

## I.   **Background**[1]

The Pennsylvania-based Rantnetwork is a corporation that develops various kinds of software, including network translation software for the mobile-phone industry. (Doc. 1-4, ¶¶ 1, 4.) The Underwoods are both residents of California. (Id. ¶ 3.) Although the complaint was originally filed on June 16, 2001, in the Pennsylvania Court of Common Pleas, Columbia County, the Underwoods removed the action to federal court on the basis of complete diversity between the parties and an excess of $75,000 in controversy, giving this court subject-matter jurisdiction under 28 U.S.C. § 1332(a).

---

[1] Following the standard of review for a motion to dismiss under Rule 12(b)(6), the complaint's well-pleaded factual allegations are taken as true, except where controverted by an opposing affidavit. See infra Parts II, III. Although the Federal Rules demand no "detailed" averments of fact in a complaint, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Those portions of the complaint that demonstrate the shortcomings disapproved of in Iqbal are disregarded. See Santiago v. Warminster Twp., 629 F.3d 121, 130–31 (3d Cir. 2010) (applying Iqbal in giving no presumption of truth to mere "conclusions").

The founder and CEO of Rantnetwork, William Grandizio, spent part of his time raising capital for the company, seeking funds for the development of the translation software. (Id. ¶ 5–6.) It was in this capacity and pursuit that Mr. Grandiozo "was placed in contact" with the Underwoods, who, following some preliminary communications, sent their agent to Bloomsburg, Pennsylvania to perform due diligence on Rantnetwork as an investment. (Id. ¶ 7.)

When the Underwoods' agent completed his investigation and, evidently, recommended investing, the Underwoods "forwarded to Rantnetwork, Inc. a Convertible Note" for $300,000, simple interest payable at 20% annually, with accrued and unpaid interest payable at the end of each calendar month. (Id. ¶ 8.) The note, dated November 19, 2007, in Elk Grove, California, required Rantnetwork to commence making payments on the interest on December 31, 2008, with the final payment of the principal and any remaining accrued interest due on November 15, 2010. (Id.; see also Doc. 1-4, at 11 (reproducing the note).) The note contained a clause that allowed the Underwoods to "convert all or any part" of the then-outstanding principal and interest "into that number of shares" of Rantnetwork's common stock. (Doc. 1-4, at 11 cl. 2.)

With the Underwoods' investment in hand, Mr. Grandizio continued working on the translation software, establishing business partnerships, and seeking further capital to finance the software's development and marketing. (Doc. 1-4, ¶ 9.) However, Mr. Grandizio died on August 26, 2008, at which point Rantnetwork's software was yet incomplete. Although the company had accrued investment

3

capital of at least $475,000—$300,000 from the Underwoods and $175,000 from Dr. Mancuso—"additional capital was needed to bring the product to mass market." (Id. ¶¶ 10, 11.)

After Mr. Grandizio's death, his widow, Elisa, took the company's reins and sought to determine the company's financial standings and the barriers yet in place to market entry. (Id. ¶ 12.) Elisa hired a new CEO for Rantnetwork, Kenneth Volet, whose primary tasks were to complete the software's development, bring it to market, and avoid taking the company into bankruptcy. (Id. ¶ 13.) He became Rantnetwork's CEO on October 15, 2008. (Doc. 9, at 18 ¶ 1.)

As CEO, Volet assessed Rantnetwork's financial condition and "found it to be grossly undercapitalized" to the point that the company's "very existence" was "tenuous." (Id. ¶ 14.) Volet then contacted Rantnetwork's shareholders, lienholders, creditors, and suppliers, providing them with his assessment of the company's precarious condition and asking them to be patient while he tried to "salvage" the company, its translation-software product, and the investments that the company had received. (Id. ¶ 15.) The financial condition of the company prevented Rantnetwork from making the monthly payments on the Underwoods' note. (Id. ¶ 16.) "Over the following year," Dr. Mancuso, brother to Elisa Grandizio, "made it known to Mr. Volet that he was able and willing" to invest another $500,000 in Rantnetwork if such funds were needed. (Id. ¶ 17.)

Enter the fateful email. On December 29, 2009, Mr. Underwood, purportedly acting on behalf of both himself and Mrs. Underwood, sent the following email "to

4

the shareholders, officers and representative of Rantnetwork," including Dr.

Mancuso:

> I thought you all should know of recent communications between Ken
> Volet and myself. Please read below. As you must understand not one
> single promise made by Rant [sic] to me has ever been kept. I will seek
> aggressive collection efforts if I do not receive some payment.
>
> Ken,
>
> Your answers are not sufficient. I must demand some form of payment
> even if it is minimal. Also, you have not been proactive in keeping
> investors updated. I have to regularly ask for updates.
>
> Please let me know when a payment will arrive. I will be forced to seek
> legal action if I do not receive a check soon.

(Id. ¶ 18; see also Doc. 1-4, at 22 (reproducing the email).)

Dr. Mancuso made no further investments in Rantnetwork after this email was sent.

Rantnetwork alleges that Dr. Mancuso's decision not to invest further funds

in Rantnetwork was the "result of" the Underwoods' email. (Doc. 1-4, ¶ 19.) It

asserts that the Underwoods' sending of that email "served no legitimate purpose

and was intentionally and improperly done to place Rantnetwork, Inc. in a bad light

to pressure it into paying the Underwood debt when, because of the untimely death

of William Grandizio, it did not have the means to do so." (Id. ¶ 20.) This email,

insists Rantnetwork, caused Dr. Mancuso to refrain from further investment in the

company. Count I of the complaint maintains on this basis that the Underwoods

intentionally interfered with prospective contractual relations between the

company and its potential investors—namely, for present purposes, Dr. Mancuso.

(Id. ¶¶ 21, 22.)

As a result of the Underwoods' email—scaring off potential investors (especially Dr. Mancuso)—Rantnetwork was unable to complete its contract for development of the translation software; the inability to complete the contract caused Rantnetwork to "forfeit" its "preliminary payment" and lose "all rights and access to the software application developed." (Id. ¶ 24). Consequently, Rantnetwork was forced to shut down its demonstration system and customer-trials program, which brought an end to sales and marketing activities, as well as the loss of customers and revenues. (Id.) Lost, too, were another software-distribution contract, sales opportunities, and market traction with eleven other international telephone carriers. (Id.) Ultimately, Rantnetwork "was forced to end all sales and marketing campaigns while it was required to redevelop the application with a new technology partner as a result of the loss of the rights under the software development contract previously entered into which were forfeited as set forth above." (Id.) The damages: $5,478,166.00. (Id.)

Count II of the complaint requests that the Underwoods be enjoined "from intentionally interfering with" Rantnetwork's prospective contractual relations, because without such an injunction, says Rantnetwork, the company will suffer irreparable harm, and it has no adequate remedy at law. (Id. ¶¶ 26–27.)

One week after removing this action to federal court on July 8, 2011, the Underwoods filed the pending motion (Doc. 3) to dismiss the complaint, wherein they set forth two separate grounds for dismissal. First, they contend that this court lacks personal jurisdiction over them, making dismissal appropriate under Federal

6

Rule of Civil Procedure 12(b)(2). (Doc. 3, ¶¶ 17–34.) Second, the Underwoods argue for dismissal under Rule 12(b)(6) based on the the complaint's failure to adequately state a claim of intentional interference with prospective contractual relations against them. The Underwoods' motion alternatively seeks a stay of this action pending resolution of a purported related action currently under way in California state court. (Id. ¶¶ 51–60.)

## II.   **Standard of Review**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)). Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry. See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1947 (2009)). Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded. Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." Ashcroft v. Iqbal, 556U.S. 662, 129 S. Ct. at 1950 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 662, 129 S. Ct. at 1949. When the complaint fails to present a prima facie case of liability, however, courts should generally grant leave to amend before dismissing a complaint. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116–17 (3d Cir. 2000).

III.   **Discussion**[2]

Among the issues contested at this juncture is this court's exercise of personal jurisdiction over the Underwoods. Complicating the resolution of this contest is Rantnetwork's allegation that Mr. Underwood was acting as his wife's agent, the theory being that, although the vast majority of acts that Rantnetwork claims to support the exercise of personal jurisdiction were allegedly undertaken by Mr. Underwood (particularly the sending of the December 29, 2009, email), those acts can be imputed to Mrs. Underwood if she were Mr. Underwood's principal–- and thus this court would have personal jurisdiction over her as well. Essentially, Rantnetwork argues that the court has personal jurisdiction over Mrs. Underwood via her role as principal to her husband.

Because the alleged principal–agent relationship between Mrs. and Mr. Underwood not only creates a threshold question affecting the jurisdictional analysis but is intertwined with the question of jurisdiction itself, the determination of whether Rantnetwork has sufficiently established its claim of agency must precede the personal-jurisdiction inquiry.

---

[2] Subject-matter jurisdiction in this case is based on diversity of citizenship. Accordingly, Pennsylvania law applies to the parties' substantive claims, with the state's Supreme Court decisions binding on this court and the Superior Court decisions nonbinding but persuasive. State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 107 n.2 (citing Jewelcor Inc. v. Karfunkel, 517 F.3d 672, 676 n.4 (3d Cir. 2008)); Norfolk S. Ry. Co. v. Basell USA Inc., 513 F.3d 86, 91–92 (3d Cir. 2008).

## A.   Existence of an Agency Relationship

Under Pennsylvania law, all agency relationships have three basic features in common: (1) "the manifestation by the principal that the agent shall act for him"; (2) "the agent's acceptance of the undertaking"; and (3) "the understanding of the parties that the principal is to be in control of the undertaking." Scott v. Purcell, 415 A.2d 56, 61 (Pa. 1980) (quoting Restatement (Second) of Agency § 1, cmt. b (1958)). Although Pennsylvania recognizes four kinds of agency—actual (or express)[3] authority, apparent authority, implied authority, and agency by estoppel—agency relationships typically arise through the granting of either actual or apparent authority.[4] These two kinds receive focus here.

Express or actual authority is directly granted by the principal to the agent, whereas apparent authority arises from representations that the principal makes to those third parties with whom the agent acts on the principal's behalf. Reifsnyder v. Doughterty, 158 A. 98, 100 (Pa. 1930). In the case of apparent authority, the answer to a question essentially appealing to common sense determines whether such authority is legitimate: "The test . . . is whether a man of ordinary prudence,

---

[3]  The most precise definitions of express authority and actual authority evince slight differences between them, but recognizing those distinctions in the context of this case would be a hair-splitting distraction.

[4]  The four kinds of agency are concisely defined in Bolus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. 1987) (quoting SEI Corp. v. Norton & Co., 631 F. Supp. 497 (E.D. Pa. 1986)). For a brief discussion of why actual and apparent authority are usually the focus of disputes over agency, see generally Scott v. Lackey, No. 02-1586, 2010 WL 272275, at *5 & n.12 (M.D. Pa. Jan. 20, 2010).

diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." Apex Fin. Corp. v. Decker, 369 A.2d 483, 485–86 (Pa. Super. 1976) (citing Murphy v. Beverly Hills Realty Corp., 98 Pa. Super. 183 (1930)).

Whether the alleged authority is actual, apparent, or otherwise, "the element of control is the touchstone of a principal–agent relationship." Johnson v. Summa Corp., 632 F. Supp. 122, 125 (E.D. Pa. 1985) (citing Kelly v. U.S. Steel Corp., 170 F. Supp. 649 (W.D. Pa 1959)). Accord Scott v. Lackey, No. 02-1586, 2010 WL 272275, at *6 (M.D. Pa. Jan. 20, 2010) (citing Colantonio v. Hilton Int'l Co., No. 03-1833, 2004 WL 1274387, at *6 (E.D. Pa. June 8, 2004)). See also Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Smalitch v. Westfall, 269 A.2d 476, 480 (1971)) ("[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary.") (alteration in original). Of equally broad applicability in all matters of agency, "the agent must act with the utmost good faith in furthering and advancing the principal's interests," which includes "a duty to disclose to the principal all relevant information." Basile, 761 A.2d at 1120 (citing Sylvester v. Beck, 178 A.2d 755, 757 (Pa. 1962)).

The existence of an agency relationship is a question of fact. Volunteer Fire Co. v. Hilltop Oil Co., 602 A.2d 1348, 1351 (Pa. Super. 1992) (citing Bolus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. 1987)). The party claiming that an agency relationship exists has the burden of so showing. Id. (citing Apex Fin. Corp. v. Decker, 369 A.2d 483, 485 (Pa. Super. 1976). This burden ultimately requires the

party asserting agency to prove it "by a fair preponderance of the evidence," id., but given that, in this case, the issue of agency before the court is cast as part of the jurisdictional question, Rantnetwork is held to the same burden of production here as in the context of jurisdiction itself: to the extent that the Underwoods contest agency in Mr. Underwood's affidavit, Rantnetwork must make a prima facie showing of an agency relationship between the Underwoods through the introduction of its own "affidavits or other competent evidence." See infra Part III.B. Cf. Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009) (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002)) (placing an equivalent burden of production on a plaintiff when the defendant has raised a jurisdictional defense). Direct proof is unnecessary when the proffered evidence allows an inference of "at least an implied intention to create the relationship of principal and agent." Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292 (E.D. Pa. 2008) (quoting B & L Asphalt Indus., Inc. v. Fusco, 753 A.2d 264, 269 (Pa. Super. 2000)). However, the "mere showing that one person does an act for another" does not give rise to an inference that an agency relationship existed. Fusco, 753 A.2d at 269 (citing Ferry v. Fisher, 709 A.2d 399, 409 n.5 (Pa. Super. 1998)).

In its brief opposing dismissal and attachments thereto, Rantnetwork emphasizes four facts in support of its claim that Mrs. and Mr. Underwood were engaged in a principal–agent relationship. First, Rantnetwork points out, Mrs. Underwood was a party to the $300,000 note; second, she wired $50,000 of the loan

12

to Rantnetwork; third, she was copied on certain emails that her husband sent to Rantnetwork's representatives regarding the status of their loan; and fourth, the consultant who performed due diligence on Rantnetwork before the Underwoods made their full investment was paid with funds from the loan (to which, of course, Mrs. Underwood was a party).

"*Quod erat demonstrandum*," Rantnetwork effectively says, proffering these four facts to the court. "Why would Troy Underwood copy his wife, a party to the note, with emails dealing with collection of their joint debt," Rantnetwork rhetorically asks in its brief, "if he was not acting as her agent?" (Doc. 9, at 8.) Rantnetwork points out that of the two defendants, Mr. Underwood was the sole person that acted first to negotiate the loan and then attempt to collect upon it, which supports an inference that he was all the while "acting on behalf of his wife." (Id.)

But the very documents that Rantnetwork submitted in an attempt to show a principal–agent relationship between the Underwoods belie such a claim. Even when viewed in a light most favorable to Rantnetwork, neither the well-pleaded allegations of the complaint nor other competent evidence before the court do so much as hint at Mrs. Underwood possessing the critical element of control in her relationship with Mr. Underwood. To the contrary, all the relevant material before the court tends to show that Mr. Underwood acted independently in his business dealings with Rantnetwork. Of the sixty-two emails between Mr. Underwood and Rantnetwork that Rantnetwork chronicled in the attachments to its opposition brief (See Doc. 9, at 18–20, 21–22), Mr. Underwood copied only five of those emails to Mrs.

13

Underwood. The instance in which Mrs. Underwood sent $50,000 to Rantnetwork

personnel appears to have been taken at Mr. Underwood's behest, according to

emails that Rantnetwork submitted:

> On Feb 22, 2008, at 7:50 AM, <bill@rantnetwork.com> wrote:
>
> Hello Troy—
>
> When possible could you wire $50K to our account. It's now time to prepare for our 3 new deployments for the next 60 days. . . . .
>
> . . . .
>
> Regards,
>
> Bill [Grandiozo]

(Doc. 9, at 30.) Mr. Underwood responded by email the next morning: "Hi bill

sounds great! I'm out of town but christina will send $50,000 on Monday."[5] (Id.)

Other than that single instance, Mrs. Underwood was neither the sender nor among

the direct recipients of any communications regarding the business relationship

between the Underwoods and Rantnetwork. The five emails that she received

copies of represent about eight percent of the sixty-two emails that Rantnetwork

documented. And as to the email central to Rantnetwork's complaint—the one that

Mr. Underwood sent on December 29, 2009, which allegedly caused Dr. Mancuso to

cease further investment in Rantnetwork—Mrs. Underwood neither sent nor

received that email; in addition, she appears not to have been among the carbon-

copy recipients. Nor indeed, as the Underwoods assert, is there the slightest

---

[5] Typographic and other errors are reproduced here as they appear in the record.

14

suggestion anywhere in the present record that Mrs. Underwood played any role in formulating or in causing that email to be sent.

In short, upon review of the well-pleaded allegations in the complaint and other competent evidence before the court, there is nothing but speculation to support the notion that Mr. Underwood sent the December 29th email at his wife's direction or that she was otherwise, at any point, in control of the relationship between the Underwoods and Rantnetwork. Rantnetwork has failed to make a prima facie showing that Mr. Underwood served as agent for his wife. As a result, there is no basis upon which to impute any of Mr. Underwood's acts to Mrs. Underwood, and the questions of whether this court may exercise personal jurisdiction over each of the Underwoods require separate analyses to answer.

### B. Personal Jurisdiction

Personal jurisdiction "represents a restriction on judicial power . . . as a matter of individual liberty," and relates to whether a court may permissibly exercise decision-making power over a defendant. Ruhrgas v. Marathon Oil Co., 526 U.S. 574, 584 (1999) (quoting Ins. Corp. of Ireland v. Comagnie dex Bauxites de Guinee, 456 U.S. 694, 702 (1982)). Because the fundamental issue is not the court's ability to adjudicate the dispute but the court's ability to issue decisions affecting a given person's rights, a defendant may either invoke jurisdictional limitations or waive them. Defendants believing that a court does not have personal jurisdiction over them bear the burden of raising the issue. Id.; Clark v. Matsushita Elec. Indus. Co., 811 F. Supp. 1061, 1064 (M.D. Pa. 1993) (citing Fed. R. Civ. P. 12(h)(1)

15

(indicating that the defense of lack of personal jurisdiction is waivable)); Fed. R. Civ.

P. 12(b)(2) (allowing a defendant to move to dismiss for lack of personal jurisdiction).

Once a defendant has raised a jurisdictional defense, the burden shifts to the

plaintiff to "prov[e] by affidavits or other competent evidence that jurisdiction is

proper." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009)

(alteration in original) (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d

Cir. 1996)) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002)). In

the absence of an evidentiary hearing, a plaintiff "need only establish a prima facie

case of personal jurisdiction," because as with Rule 12(b)(6) motions to dismiss, "a

court is required to accept the plaintiff's allegations as true, and is to construe

disputed facts in favor of the plaintiff." Id. (quoting O'Connor v. Sandy Lane Hotel

Co., 496 F.3d 312, 316 (3d Cir. 2007) and Toys "R" Us, Inc. v. Step Two S.A., 318 F.3d

446, 457 (3d Cir. 2003)).

Because Pennsylvania's long-arm statute authorizing personal jurisdiction,

42 Pa. Cons. Stat. Ann. § 5322(b) (West 2011), is coextensive with the Due Process

Clause, "the statutory assessment of jurisdiction collapses into the constitutional

one." Clark v. Matsushita Elec. Indus. Co., 811 F. Supp 1061, 1065 (M.D. Pa. 1993).

There are two forms of personal jurisdiction: specific and general. In rough

terms, specific jurisdiction allows a court to adjudicate the rights of a nonresident

person whose activities within or directed toward the forum of adjudication are

related to the subject matter of the action, whereas general jurisdiction allows

adjudication over a dispute even when the person's connections to the forum are

unrelated to the dispute, although the exercise of such jurisdiction requires the person to have "systematic and continuous contacts" with the forum state—a much higher threshold. <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 n.8, 415 n.9 (1984); <u>Marten v. Godwin</u>, 499 F.3d 290, 296 (3d Cir. 2007); <u>Telcordia Tech Inc. v. Telkom S.A.</u>, 458 F.3d 172, 177 (3d Cir. 2006). The "central concern" of the personal-jurisdiction inquiry is the particular facts that define "the relationship among the defendant, the forum, and the litigation." <u>Shaffer v. Heitner</u>, 433 U.S. 186, 204 (1977).

Because Rantnetwork makes no argument that either of the Underwoods' contacts with Pennsylvania would be sufficient to support the exercise of general jurisdiction, specific jurisdiction will be the sole focus of the court's jurisdictional analysis.

### (1) **Doctrinal principles of specific jurisdiction**

Three factors determine whether the court has specific personal jurisdiction over a party: (1) whether the party purposefully directed his activities at the forum; (2) whether the litigation relates to at least one of those activities; and (3) if the first two requirements are met, the court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice. <u>D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,</u> 566 F.3d 94, 102 (3d Cir. 2009) (citing <u>Burger King</u>, 471 U.S. 462, 476 (1985)). <u>See also Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958) (citing <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 319 (1945) (calling it "essential" that the defendant "purposefully avail[] itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws").

The first two parts of the test "determine whether a defendant has the requisite minimum contacts with the forum." <u>D'Jamoos,</u> 566 F.3dat 103. The defendant's physical entrance into the forum is not necessary. <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476 (1985); <u>Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.</u>, 988 F.2d 476, 482 (3d Cir. 1993). When a defendant has "deliberately" engaged in "significant activities" or created "'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." <u>Burger King</u>, 471 U.S. at 474, 475–76 (citations omitted) (quoting <u>World-Wide Volkswagen Corp.</u>, 444 U.S. 286, 295 (1980)) (citing <u>Travelers Health Ass'n v. Virginia</u>, 339 U.S. 643, 648 (1950)). Litigation against the defendant in that forum becomes foreseeable, and "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." <u>Id.</u>

The final factor is consideration of whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" <u>Burger King</u>, 471 U.S. at 476 (alteration in original) (quoting <u>Int'l Shoe</u>, 326 U.S. at 320). The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>Id.</u> at 477. If a plaintiff establishes that a defendant has minimum contacts with the forum state, jurisdiction will be unreasonable only in those "rare cases" where the defendant

meets its "heavy" burden of showing "an absence of fairness or lack of substantial justice." <u>Pennzoil Prods. Co. v. Colelli & Assocs., Inc.</u>, 149 F.3d 197, 207 (3d Cir. 1998); <u>Grand Entm't Grp.</u>, 988 F.2d at 483. <u>See also</u> <u>Asahi</u> <u>Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

**(2)**   **Application to Troy Underwood**

As the following paragraphs show, Rantnetwork has set forth sufficient facts to make out a prima facie case that this court may exercise jurisdiction over Mr. Underwood. This conclusion rests upon application of the traditional three-step analysis for specific jurisdiction rather than the "effects" test first enunciated in

Calder v. Jones, 465 U.S. 783 (1984),[6] on which both parties based their

jurisidictional arguments.

According to the complaint, the affidavit of Kenneth Volet, and other

competent evidence that Rantnetwork has submitted in connection with the

pending motion, the court finds, for the sole purpose of adjudicating this motion,

_____

[6] In the briefing (Docs. 8, 9, 10) on the pending motion, both Rantnetwork
and the Underwoods focused their jurisdictional arguments exclusively on the
Calder effects test, apparently in reliance on a prior memorandum and order that
this court issued: Scott v. Lackey, No. 02-1586, 2010 WL 272275 (Jan. 20, 2010)
(Conner, J.). The following passage appears in Lackey: "When a defendant is charged
with committing an intentional tort, the court's jurisdictional inquiry is guided by the
'Calder effects test.'" (Id. at *9 (citing Calder v. Jones, 465 U.S. 783, 788–90, (1984);
Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 n.2 (3d Cir. 2004); IMO Indus., Inc. v.
Kierkert AG, 155 F.3d 254, 261 (3d Cir. 1998)). The parties in this case seem to have
read Lackey to mean that the Calder effects test controls the jurisdictional inquiry in
intentional-torts cases, but this is not so. Rather, Calder merely provides an
alternative route to satisfying constitutional due process requirements.
        Calder held that jurisdiction over out-of-state parties was proper because
their intentional conduct was "calculated to cause injury" to the respondent in
California, Calder, 465 U.S. at 791, but not before remarking that a plaintiff's "lack
of 'contacts' will not defeat otherwise proper jurisdiction," id. at 788 (citing Keeton
v. Hustler Magazine, Inc., 465 U.S. 770, 777–81 (1984)). This general language in
Calder suggested that satisfying the "effects" test is not the only way to establish
jurisdiction in intentional-tort cases. The Third Circuit made this suggestion
explicit in a subsequent case applying Calder, stating that Calder did not "carve out
a special intentional torts exception to the traditional specific jurisdiction analysis."
IMO Indus., Inc. v. Kierkert AG, 155 F.3d 254, 265 (3d Cir. 1998). Rather, the unique
circumstances that intentional-tort cases present may sometimes "render the
defendant's contact with the forum—which otherwise would not satisfy the
requirements of due process—sufficient." Id.
        Although the parties' briefs do not incorporate the traditional specific-
jurisdiction analysis, this court is still free to undertake the analysis itself: "When an
issue or claim is properly before the court, the court is not limited to the particular
legal theories advanced by the parties, but rather retains the independent power to
identify and apply the proper construction of governing law." Tenafly Eruv Assoc.,
Inc. v. Borough of Tenafly, 309 F.3d 144, 158 n.15 (3d Cir. 2002) (quoting Kamen v.
Kemper Fin. Servs., Inc., 500 U.S 90, 99 (1991)) (internal quotation marks omitted).

that Troy Underwood has purposefully directed toward the forum state of

Pennsylvania sufficient activities related to this litigation to satisfy the

constitutional "minimum contacts" requirement. Near the beginning of Mr.

Underwood's series of related activities is his and his wife's issuance of the $300,000

convertible note to Rantnetwork, a Pennsylvania corporation, after an agent that

Mr. and Mrs. Underwood hired had traveled to Pennsylvania to perform due

diligence on Rantnetwork. Both before and after issuing the note, Mr. Underwood

carried on a series of emails and telephone conversations with Pennsylvania-based

Rantnetwork personnel; by Rantnetwork's count, Mr. Underwood sent or received

at least sixty-two emails to or from Rantnetwork personnel spanning a period of

over two years, all of which concerned Rantnetwork's product development or the

repayment of the note that the Underwoods issued. (Doc. 9, at 18–27, 30.) Finally,

Mr. Underwood sent the December 29, 2009, email that forms the basis of this claim

to at least six recipients, four of whom were residents of Pennsylvania. Mr.

Underwood's years-long series of contacts, directed toward Pennsylvania,

exclusively concerning Rantnetwork or the note he and his wife issued to

Rantnetwork and culminating in the very email that led Rantnetwork to file suit

against the Underwoods, can be characterized as nothing less than "minimal" for

constitutional due process purposes.

Mr. Underwood has set forth no overriding concerns that, in light of his

contacts with Pennsylvania, would make this court's exercise of jurisdiction over

him unconstitutional in the present case. To the contrary, his issuance of the

$300,000 note to Rantnetwork, which by its very terms established a relationship between them that would last nearly three years (See Doc. 1-4, at 11) created continuing obligations between Mr. Underwood and Rantnetwork. The note, combined with Mr. Underwood's subsequent related activities—his communications with Rantnetwork to keep abreast of its product development and to attempt collection on his note—evince his deliberate availment of the privilege of conducting business in Pennsylvania and made litigation against him in this forum both foreseeable then and presumptively reasonable now. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985) (citations omitted) (quoting World-Wide Volkswagen Corp., 444 U.S. 286, 295 (1980)) (citing Travelers Health Ass'n v. Virginia, 339 U.S. 643, 648 (1950)). Nothing before the court suggests that this is one of those rare cases that, despite Mr. Underwood's at-least-minimal contacts with Pennsylvania, jurisdiction would be unfair or unjust. Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 207 (3d Cir. 1998).

### (3)      **Application to Christina Underwood**

In contrast to her husband, and despite some overlap between the facts concerning their contacts with this state, Christina Underwood's connection with Pennsylvania is too tenuous for this court to exercise jurisdiction over her person in a way that would comport with the requirements of constitutional due process. The

following paragraphs explicate the different answers to the jurisdictional question for the husband-and-wife defendants.[7]

To restate briefly the three parts of the traditional analysis for specific personal jurisdiction, jurisdiction properly lies in a given forum when (a) the defendant purposefully directed activity toward or availed herself of the privilege of conducting business in the forum; (b) the litigation relates to or arises out of such activity; and (c) exercising jurisdiction otherwise comports with traditional notions of fair play and substantial justice. See Part III.B.1 supra.

For the sake of clarity in maintaining the distinctions between the analyses for the codefendants, each of the three parts of the jurisdictional analysis will be addressed seriatim.

### a.    __Purposefully directed activity__

"Reaching out" to create a business relationship with a resident of the forum state generally supports constitutes purposefully directed activity. The Supreme Court clearly enunciated this doctrinal principle at least as long ago as 1985, stating: "[W]ith respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and

---

[7] As in the previous section—discussing whether personal jurisdiction over Mr. Underwood lies in Pennsylvania—the analysis here focuses on the traditional three-part minimum-contacts analysis. Not only does Calder not control the jurisdictional inquiry, as explained in note 6 supra, but application of the Calder effects test to Mrs. Underwood's would clearly counsel against exerting jurisdiction: the sole basis of the intentional-tort claim, which would also form the operative basis of the Calder effects test, is an email sent by Mr. Underwood that cannot be imputed to his wife.

obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) (quoting Travelers Health Ass'n. v. Virginia, 339 U.S. 643, 647 (1950) (citing McGee v. Int'l Life Ins. Co., 355 U.S. 220, 222–23(1957).

In Burger King, defendant Rudzewicz (of Michigan) applied to be a franchisee of Burger King (a Florida corporation) and ultimately had his franchise terminated for failure to make franchise payments. Id. at 464–66, 68. Burger King filed suit against Rudzewicz in Florida; the Supreme Court upheld the district court's exercise of jurisdiction over him despite his lack of physical ties to Florida. Id. at 479–80. Reasoning that the litigation "grew directly out of" a contract that had a "substantial connection" with Florida—a contract that Rudzewicz "deliberately 'reach[ed] out beyond' Michigan" to negotiate with a Florida corporation rather than take "the option of operating an independent local enterprise"—the Court held that the "quality and nature" of his relationship to the Florida-based company could "in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" Id. (alteration in original) (quoting Travelers Health Ass'n, 339 U.S. at 647, Hanson v. Denckla, 357 U.S. 235, 253 (1958), Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984), and World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 299 (1980)).

Significantly, it was entirely Rudzewicz' own actions that prompted the suit against him: his "refusal to make the contractually required payments in Miami" and his "continued use of Burger King's trademarks and confidential business information . . . caused foreseeable injuries to the corporation in Florida." Id. at 480.

24

However, the Court was careful to avoid creating a hard-and-fast rule that a defendant who enters into a contract with a resident of another state is, simply by virtue of that contract, subject to suit in that state. Asking hypothetically "whether an individual's contract with an out-of state party alone can automatically establish minimum contacts in the other party's home forum," the Court answered its own question in no uncertain terms: "[W]e believe the answer clearly is that it cannot." Id. at 478. See also id. at 478–79 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)) (underscoring the Court's longstanding rejection of "mechanical" tests for personal jurisdiction).

The Third Circuit decided a case some years later that had facts in many ways analogous to those in Burger King, ultimately reaching a similar conclusion, although the court called the jurisdictional question "close." Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992). Mellon Bank, a Pennsylvania corporation, filed suit in Pennsylvania district court against several nonresident defendants who were limited partners of limited partnerships. Id. at 1219. Before Mellon filed suit, these limited partnerships sent their mortgage broker to Mellon to seeking financing for the partnerships. Id. at 1219–20. The broker told Mellon that the limited partners would personally guarantee any loans made to the partnerships; the partnerships themselves insisted to Mellon that "the talent and experience that each partner brough to the partnerships was fundamental to their success." Id. Based in part on these representations, Mellon made over $4 million in

loans to the partnerships, but the partnerships defaulted on all the loans and the guarantors all failed to remit payment. Id.

In upholding the district court's personal jurisdiction over the partnerships, the Third Circuit stressed that "Mellon did not approach the borrowers seeking to lend money nor did Mellon initially request the [guarantees]." Id. at 1223. Rather, the partnerships had approached Mellon, establishing through their own deliberate efforts a business relationship with the Pennsylvania-based bank. Id.

A third case provides contrast to Burger King and Mellon Bank: when a nonresident defendant is merely a "passive buyer" of a plaintiff's products, the defendant is unlikely to be found to have purposefully directed its activities toward the plaintiff's home state. See Vetrotex Certainteed Corp v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 148, 152–53 (3d Cir. 1996) (discussing the differing consequences, for jurisdictional purposes, of whether the plaintiff or the defendant actively solicited a business relationship). In that case, Vetrotex CertainTeed Corporation (Vetrotex), a Pennsylvania corporation, sued California-based Consolidated Fiber Glass Products Company (Conglas) in Pennsylvania district court. Id. at 148. On appeal, the Third Circuit held that personal jurisdiction over Conglas did not lie in Pennsylvania because Conglas did not purposefully direct its activities there. Id.

The district court in Vetrotex had found the following facts undisputed, which the appellate panel recounted thus:

26

> Vetrotex solicited Conglas to obtain the 1991–92 contract by telephone and by personal visits to Conglas headquarters in California. The parties engaged in telephone communication prior to entering into the 1991–92 contract. Conglas signed the disputed contract in California and sent it to Vetrotex in Pennsylvania. Conglas made all payments for goods to Vetrotex CertainTeed's California office. Under the disputed contract, Vetrotex did not deliver any goods to Conglas in Pennsylvania.

Id. at 152. On these facts, the Vetrotex court characterized Conglas as "merely a passive buyer of Vetrotex's product." Id. Distinguishing the case from others in which jurisdiction over a nonresident defendant was found proper largely on the basis of the defendant's contract with a plaintiff residing in the forum, the Third Circuit observed that Vetrotex was not a case in which the defendant "solicited the contract," "initiated the business relationship leading up to the contract," "sent any payments to the plaintiff in the forum state," or "engaged in extensive post-sale contacts with the plaintiff in the forum state." Id. at 152–53 (citing and distinguishing Mellon Bank, 960 F.2d at 1217, N. Penn Gas v. Corning Natural Gas, 897 F.2d 687, 690–91 (3d Cir. 1990), and Mesalic v. Fiberfloat Corp., 897 F.2d 696, 700 (3d Cir. 1990)). See also id. at 152 n.5 (quoting United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)) (citing Bell Paper Box, Inc. v. Trans Western Polymers, Inc., 53 F.3d 920, 922 (8th Cir. 1995) and Margaret G. Stewart, A New Litany of Personal Jurisdiction, 60 U. Colo. L. Rev. 5, 45–46 (1989)) (remarking that in the 8th Circuit, "'reaching out' is particularly difficult to find" when the nonresident defendant is a buyer, not a seller, of the resident plaintiff's products, a distinction "even more telling when the defendant is a 'passive' buyer" solicited as a

27

customer by the plaintiff; and observing that the First Circuit requires a defendant's "forum-related activities in contract cases [to have been] 'instrumental in the formation of the contract.'")

Applying the principles and comparing the facts of these three cases—Burger King, Mellon Bank, and Vetrotex—to the instant case elucidates the basis for holding that Christina Underwood did not purposefully direct her activities toward Pennsylvania, even though her husband did.

The nature of the relationship between the Underwoods and Rantnetwork shows that the Underwoods have much in common with what the Vetrotex court and the Eighth Circuit have called "passive buyers."[8] It was Rantnetwork, not the Underwoods, that initiated the business relationship and solicited the loan from the Underwoods. Vetrotex, 75 F.3d at 152. (Compare Doc. 1-4, ¶¶ 7–8 (Rantnetwork's allegation in the complaint that Grandizio, Rantnetwork's CEO, "was placed in contact with" the Underwoods, who later "forwarded" the convertible note to Rantnetwork) with Doc. 3-2, ¶¶ 5–6, 9 (Troy Underwood's declaration that he and his wife were approached by Rantnetwork personnel; that such personnel solicited their investment in the company; and that Rantnetwork "made, executed and delivered" the note to them in California to reflect their loan of $300,000 to the

---

[8] The analogy of the Underwoods to (passive) buyers, rather than just lenders, receives support from the provision in the note that gave the Underwoods the option of converting some or all of the principal and interest of their loan into shares of Rantnetwork's stock, although nothing before the court suggests that this option was exercised.

company).) Moreover, although the Underwoods did send money to Rantnetwork in Pennsylvania ($50,000 of which was allegedly sent by Mrs. Underwood), these transfers were not independent transactions but separate remittances of a single loan to Rantnetwork. See Vetrotex, 75 F.3d at 152 (in explaining their holding that plaintiff had not purposefully availed itself of the forum state, giving weight to the absence of payments by defendant to plaintiff in the forum state). And, of course, there is the Supreme Court's statement that the mere existence of a contract like the convertible note under discussion here "clearly" cannot, by itself, "automatically establish sufficient minimum contacts" in the plaintiff's home state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985). If the relevant facts of the instant case went no further than those discussed in this paragraph, neither of the Underwoods, being very much like passive buyers, could be said to have purposefully availed themselves of the privileges of doing business in Pennsylvania.[9]

But the facts go further, and these further facts detail crucial differences in the Underwoods' respective activities. Although Christina Underwood remained

---

[9]  In the context of the "passive buyer" analogy, there is little significance to the Underwoods' sending of an agent to Pennsylvania to perform due diligence on Rantnetwork before they lent the company $300,000. The nascent business relationship between the parties in this case was initiated and solicited entirely by Rantnetwork, as was the loan, and from the standpoint of common good business practices, it would have been sheer foolishness for the Underwoods to loan over a quarter-million dollars to a company without conducting some limited research into that company. Cf. United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992) (requiring, in contract cases, a showing that the defendant's forum related activities were "instrumental in the formation of the contract").

largely in the background throughout the course of the relationship between the parties, apparently actively participating only to the extent that she wired $50,000 of the loan to Rantnetwork, Troy Underwood engaged in significant, extensive, and ongoing communications and other contacts with Rantnetwork after the issuance of the loan. He admits writing emails and making telephone calls to Rantnetwork (Doc. 3-2, ¶¶ 20, 22); Rantnetwork submitted a table documenting sixty-two emails sent to or received by Mr. Underwood, over the course of more than two years, that related either to Rantnetwork's product development or the company's repayment schedule for the loan (Doc. 9, at 21–22). Mrs. Underwood had no telephone communication with Rantnetwork (Doc. 3-2, ¶ 23); she sent no emails to Rantnetwork (Id. ¶ 21); and of the dozens of emails exchanged between Mr. Underwood and Rantnetwork, Mrs. Underwood was copied on only five of them. Further, Rantnetwork's Cap Table dated July 1, 2009, lists Mr. Underwood, but not Mrs. Underwood, as a partial owner of Rantnetwork (Doc. 9, at 28), and an agreement authorizing an increase in Rantnetwork's authorized shares from 1000 to 2000 listed Mr. Underwood, but not Mrs. Underwood, as a party to the agreement, despite the agreement stating that the named partiers were "all of the shareholders" of Rantnetwork (id. at 29). Finally, the December 29, 2009, email that precipitated the instant matter was sent by Mr. Underwood, not Mrs. Underwood, and as discussed in Part III.A supra, there is no basis to impute the sending of this email to Mrs. Underwood.

30

Accordingly, the facts as currently presented to the court definitively establish that Christina Underwood did not engage in extensive contacts with Rantnetwork after the issuance of the loan. Her conduct throughout the relevant time span makes her analogous to the "passive buyer" described in <u>Vetrotex</u> and unlike the active solicitors of out-of-state business discussed in <u>Burger King</u> and <u>Mellon Bank</u>. The facts of this case and the applicable law point unerringly to the conclusion that Christina Underwood did not "reach out" to Pennsylvania and did not "purposefully avail" herself of the privilege of conducting business in Pennsylvania.

> **b.** **<u>"Relates to" or "arises out of" forum-related activity</u>**

Although Mrs. Underwood, as a cosigner of the loan to Rantnetwork, could be said to have committed acts "but for" which this litigation would not have arisen (i.e., but for the loan that she and her husband made to Rantnetwork, Mr. Underwood would not have sought payment on the loan and would not have sent the email that prompted Rantnetwork to file suit), but-for causation "cannot be the sole measure of relatedness because it is vastly overinclusive in its calculation of a defendant's reciprocal obligations." <u>O'Connor v. Sandy Lane Hotel Co., Ltd.</u>, 496 F.3d 312, 322 (3d Cir. 2007). As the parenthetical remark above illustrates, but-for causation "has . . . no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain." <u>Id.</u> (alteration in original) (quoting <u>Nowak v. Tak How Invs., Ltd.</u>, 94 F.3d 708, 715 (1st Cir. 1986)).

To avoid such absurd results, the O'Connor court held that specific jurisdiction "requires a closer and more direct causal connection than that provided by the but-for test." Id. at 323. And by any "closer and more direct" measure, the instant action cannot be characterized as relating to or arising out of any of Mrs. Underwood's actions. Essentially, all that she did was jointly issue a loan to Rantnetwork, wire the company a $50,000 portion of the loan, and passively receive copies of a handful of emails containing communications between other people. Further, the loan itself is not the focus of this litigation, which is not a contract case but a tort case; the loan forms part of the background, but Rantnetwork explicitly states that Mr. Underwood's December 29, 2009 email "is the crux of [the company's] claim of intentional interference with prospective contractual relations." (Doc. 9, at 8.)

### c.     **Fair Play and Substantial Justice**

After reaching a conclusion regarding the previous two elements, together composing the "minimum contacts" test, a court has the option of considering whether the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice. Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 205. However, given Rantnetwork's failure to show that Christina Underwood has sufficient minimum contacts to warrant exercising personal jurisdiction over her in this court, no fair-play inquiry is necessary. Id.

**C.**    **Intentional Interference with Prospective Contractual Relations**

A complaint must adequately allege four elements in order to properly state a cause of action for intentional interference with prospective contractual relations: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979) (citing Glenn v. Point Park Coll., 272 A.2d 895, 898 (Pa. 1971). The dispute in the instant case focuses on the second and third elements.

With regard to intent, case law from the Pennsylvania Supreme Court establishes that the complaint must contain an allegation that the defendant acted for the specific purpose of causing harm to the plaintiff. Glenn, 272 A.2d at 899. The complaint contains no such allegation; the closest averment states only generally that Underwood's December 29, 2009, email constituted intentional and improper interference with the prospective contractual relations between Rantnetwork and potential investors (Doc. 1-4, at ¶ 21), but this is nothing more than a threadbare recitation of the tort allegedly committed—a statement devoid of any averment of fact, a legal conclusion of the sort that Twombly and Iqbal disapprove and disregard. Rantnetwork's complaint does not adequately allege intent.

Rantnetwork cites Kelly-Springfield Tire Co. v. D'Ambro, 596 A.2d 867, 872 (Pa. Super. 1991), for the proposition that a defendant need not have knowledge of the specific prospective contractual relation that the defendant allegedly interfered

33

with (and that a complaint need contain no such averment), but Rantnetwork's reliance on <u>D'Ambro</u> is misplaced for two primary reasons. First, the complaint in <u>D'Ambro</u> alleged (1) that the plaintiffs were trying to sell a warehouse they owned; (2)  that the defendant, a law firm, knew of the plaintiff's efforts; (3) the defendant filed suit against the plaintiff not to protect a legitimate interest of a client but solely "for the purpose of harrassing [the plaintiff] and interfering wrongfully with its efforts to resell the warehouse property"; and (4) potential buyers had been deterred from purchase by the pending litigation. <u>Id.</u> at 871–72. On the basis of these allegations, the <u>D'Ambro</u> court held the complaint to have sufficiently stated a claim for intentional interference with prospective business relations. <u>Id.</u> at 872. Not only was the actual claim under consideration not the same—interference with prospective *business* rather than *contractual* relations—but the litigation that the <u>D'Ambro</u> defendant initiated against the plaintiff could reasonably be expected to have a much greater cooling effect vis-à-vis prospective buyers than could the single email at issue in the instant case be expected to have on prospective investors, given that the email, sent to six people, contained only a seven-sentence forwarded message with an additional four prefatory sentences. The different legal claims in <u>D'Ambro</u> and in the present case, as well as the factual differences, make <u>D'Ambro</u> uncompelling. Second, <u>D'Ambro</u> is a Superior Court case, nonbinding on this court, whereas <u>Glenn</u> and <u>Thompson Coal Co.</u> are both decisions of the Pennsylvania Supreme Court that this court must regard as binding authority.

As to the lack of privilege or justification, Pennsylvania law contains no hard-and-fast rules delineating privileged from unprivileged conduct in this context. However, in this case, there need be no meandering through the thicket of considerations concerning what constitutes privileged or improper conduct. Mr. Underwood responded to Rantnetwork's allegation that the sending of the December 29, 2009, email was improper by claiming that the contents of the email were true—and the Pennsylvania Supreme Court recently held that a defendant's raising a truthfulness defense per Restatement (Second) of Torts § 772(a) against a claim of tortious interference obviates the need for an analysis of the relative weight of the seven otherwise-applicable considerations in § 767 of the Restatement. Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc., 20 A.3d 468, 477 (Pa. 2011) (citing Restatement (Second) of Torts §§ 766, 767, 772 (1979)). Quoting comment (b) to § 772, which states that "[t]here is of course no liability for interference with . . . a prospective contractual relation on the part of one who merely gives truthful information to another," the Walnut Street court adopted § 772 on its basis of its consistency with "the very nature of the tort" as well as Pennsylvania law. Walnut Street, 20 A.3d at 478–79 (quoting Restatement (Second) of Torts § 772 cmt. b (1979)).

Not only has Mr. Underwood claimed that the contents of his email were true, but Rantnetwork neither states in its complaint that the email's contents were untrue nor effectively rebuts Mr. Underwood's claim in its brief opposing the Underwoods' motion. In fact, Rantnetwork admits that the email truthfully states that Rantnetwork failed to repay any portion of the Underwoods' loan as of the

writing of the email. Rantnetwork attempts to minimize the significance of this admission by claiming that "the email contains more than factual assertions; it implies dishonesty on behalf of the corporation." (Doc. 9, at 14.) But, as the Underwoods' reply brief points out, Rantnetwork made no attempt to explain what those "more than factual" assertions are; and the email, rather than implying that Rantnetwork was somehow dishonest, simply states the fact that Rantnetwork had not kept its promises to repay the loan on the schedule set forth in the note. (Doc. 10, at 17, 19.)

The Underwoods' unrefuted assertion of truthfulness is sufficient grounds by itself to dismiss Rantnetwork's claim for tortious interference. Dismissal is only further justified by the complaint's failure to allege that the email was sent for the specific purpose of causing harm to the plaintiff.

### D.    Rantnetwork's request for an injunction

The complaint's failure to properly state a claim for relief renders Rantnetwork's request for an injunction moot, thus relieving the court from any need to say more on the matter than this brief statement.

### E.    Alternative motion to stay this action

The inadequacy of the complaint's statement of its sole cause of action and the consequent conclusion that the complaint should be dismissed likewise renders moot the Underwoods' alternative motion to stay this action pending the outcome of a previously filed case in California involving the same parties to the instant case.

**IV.**   **Conclusion**

For the above-stated reasons, the court will grant the motion to dismiss filed by the defendants, Troy and Christina Underwood, and deny as moot their alternative motion to stay this action. Rantnetwork shall be granted leave of court to file an amended complaint within twenty (20) days to address the deficiencies in personal jurisdiction over Christina A. Underwood and the deficiencies in its principal cause of action—intentional interference with prospective contractual relations.[10] Failure to file an amended complaint shall result in termination of the action.  An appropriate order follows.

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      March 26, 2012

---

[10]  When a complaint is found to be defective upon a successful challenge by a defendant, courts should generally grant the plaintiff leave to amend the complaint before dismissing the action with prejudice. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116–17 (3d Cir. 2000).

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RANTNETWORK, INC.** | : | **CIVIL ACTION NO. 4:11-CV-1283** |
| **Plaintiff** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **TROY R. UNDERWOOD** and | : | |
| **CHRISTINA A. UNDERWOOD,** | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 26th day of March, 2012, upon consideration of the motion to dismiss the complaint or alternatively for a stay (Doc. 3) filed by Troy and Christina Underwood, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.   The motion to dismiss is GRANTED; the complaint is DISMISSED without prejudice.

2.   The alternative motion to stay this action is DENIED as moot.

3.   Within twenty (20) days of the date of this Order, plaintiff may file an amended complaint. Failure to file an amended complaint in a timely fashion shall result in the termination of this matter and the Clerk of Court shall mark this file closed without further order of court.

 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge